All right, we are prepared to hear argument in our next case, Pacem Solutions v. Small Business Association. Mr. Johns. Good morning, Your Honor. My name is Milton Johns. I represent the appellant, Pacem Solutions International. Representative of the client is with me today, Joseph Schmitz, Esquire, as well. Our case is fully briefed before the court, so I'm not going to read from it. But there are some very salient points that I want to bring to this panel's attention. And I think that footnote 17 in the government's brief really captures this case and our argument very well. Footnote 17 of their brief says, To the extent that the May 2020 payment stoppage is a reviewable final agency action, the SBA similarly has relied solely on the single explanation for that decision provided to Atlantic in September 2020 and to the plaintiff in May 2021. Now, the September 2020 document that they're referring to is an email that takes place in September 2020, months after the stoppage in payments. And the SBA rep from Little Rock, Arkansas, acknowledges that there's been a misreporting of the status of the loan, and that may be the cause for the stoppage in payments. But the fact of the matter is- Counsel? Yes, Your Honor. Under the CARES Act, who is responsible for deciding whether the loan should be in liquidation status? Isn't that up to the lender? In liquidation status, Your Honor? Yes. That would be the lender's decision, the lender's report. And who was the email from? The email, this is Joint Appendix 37. The email is from Carvis Campbell, the loan specialist, SBA. And it goes to Atlantic Bank representative, Atlantic Union Bank, who's been trying to find out why the payments have been stopped. And it reads, it appears the loan has been misreported and showing delinquent, which may have resulted in not receiving payments. Now, again, this is September 2020, and this is months after the payments have stopped. Now, the record, in fact, doesn't show any of that, the contemporaneous record. There was a two-year investigation of the loan and the condition of the loan. And the conclusion of the investigation was that the loan really had never been regularly serviced or had been serviced for only a very short period of time. And why should we overturn the results of that investigation? Well, because, Your Honor, that investigation actually had nothing to do with the action, which was the stoppage of the payments. And there was nothing in the record to indicate that in May 2020, when that decision was made, when the payments were stopped, that any of that was the case. I mean, there is, JA35, there's one page in the record that shows information that originates at the time of the decision to stop the payments. And even then — When did the banks send its 1502 report? Well, we — That in April? Well, we believe, looking at the June 2021 printout, which is page one of the administrative record, there are entries on April 7th which show that it was current. That's a one status. We have an April 21. It is a one status. We have a May 5th entry which shows a two status. And that doesn't mean delinquent. These are the SBA guidelines for this report. That just means it's 30 to 60 days payment. But isn't the status of the loan and the question of how long it was serviced, isn't that a question for the agency in this case? I mean, we can't retry the whole matter up here. And the liquidation status of the loan and the question of how long the loan was serviced and everything, these are, it seems to me, factual questions that the agency might be more competent to resolve than we are. I mean, we're sort of stuck with this record, aren't we? Well, you are stuck with the record, Your Honor, and so is the agency. And there is no information in the record as contemporaneous to May 20th on why the agency stopped those payments. Everything else in the record is post hoc. They made the decision. They stopped the payments. Even the decision, the May 21 letter, Payson is inquiring, well, why has the payment stopped? Why have the payments stopped? They can't get any answers. There was a reason that they made the decision to stop the payments, and that was that the loan had not been serviced. Well, there's nothing in the record. You take issue with that finding, but it is a finding, and it came after a significant period of investigation. It wasn't just something that the agency snapped off. They investigated the status of the loan and whether it had been serviced, and they came to a conclusion, and you think they came to a conclusion sooner than they should have come to the conclusion, but it just seems to me that the conclusions to be drawn would lie with the sort of primary finder of fact or the primary investigator here, which is the agency. I mean, I'm just trying to find out what was exactly arbitrary and capricious about the agency's actions here. Well, it's arbitrary and capricious because there are no facts in the record contemporaneous to that action to support that decision. We have the stoppage of payment in May of 2020. The total information in the record are two entries on a report generated in June of 2021 that indicates that the loan was in a 30- to 60-day payment. There's no determination in the record. There's no information at all that the loan was in liquidation then, that the loan was not in regular servicing. There's just nothing, and in fact, the e-mail that they rely on in this footnote 17, the SBA says, it appears the loan has been misreported, which may have resulted in not receiving payments. So in effect, in May of 2020, the SBA is saying, it looks like there's a mistake here, and as a result of that mistake, they've stopped the payments, but there's nothing else in the record. Was the payment in fact made? Was it later determined that a payment was in fact made? Well, the payments weren't made because it was the SBA's responsibility to make them, and so it's an impossible loop, Your Honor. The SBA made two payments under the CARES Act. Well, don't you have a responsibility to prove that the loan was regularly serviced, at least for a six-month period? Isn't that your burden? No, the burden is to show that there's nothing in the record upon which the agency could make that determination. But don't you have And that's what the district court Don't you have something of a burden to decide, to say, look, we're wrong here, the loan was regularly serviced? The Why were five separate amendments necessary here in order to make the repayment easier? And the agency contends that at the time of the agency decision, only 7% of the principal had been retired. And I think also at the time of the decision that there were five separate amendments designed to make repayment of the loan easier for the business. And yet, you know, they keep amending it and amending it and amending it, and very little of the principal ever gets retired. And so what are we to make of that? Well, Your Honor, that really is irrelevant because the loan that was presented for approval for the CARES Act payments was at the Fifth Amendment. So that was presented to the SBA, and it was approved for the CARES Act payments. The SBA makes a decision. They take an action sometime in early late spring, early summer to stop those payments. There is nothing in the record as to why they did that. Even the post hoc determination, again, there's nothing in the record. It's all discussion that takes place in 21, 22, and 23. But no one can point to when that loan either went out of service, wasn't in regular service, but none of it is there. And so the district court is bound by the record, and the agency is bound by the record in making that determination. And, again, there's one page that has two data entries that take place a year after the decision. So the issue of the loans is, I think, the status of the loan. I think that's part of the narrative that the district court was following. But it's not the law, and it's not the record that the decision was based on. I'm concerned about the fact that you seem to be sort of retrying this case on appeal and saying that the lengthy investigation on a two-year investigation, you seem to say that everything that went on before the agency is just irrelevant. It didn't matter. And that you're saying, no, this loan was regularly serviced, and the agency's conclusion was just crazy and all the rest. But I'm not sure. There's an awful lot of evidence here, it appears to me, that indicates the loan was a lemon. And I'm concerned that you're trying to get the government to bail you out of a bad loan. And I realize that the purpose of the CARES Act is to help small businesses through proper loan guarantees. But at the same time, I don't think that the CARES Act wholly absolves bankers of at least minimally responsible loan practices. And I think that the whole question of regular servicing, which is undefined in the statute, but it's there. And I'm just worried that I just don't think that the CARES Act is important as it is in helping small businesses during a really rough period. But I'm just not sure that banks are completely let off the hook. Because we all know what are responsible lending practices and what are not. And you have to do some basic investigation of the loan recipient and the likelihood of repayment. And this seems to me, you know, from what I read in the agency record, seems to me to be a very, very ill-advised loan. And I'm just not sure what's arbitrary and capricious about the agency taking that into account. Well, Your Honor, and, you know, the Dow AgriScience case, Judge Niemeyer's panel said that when the court is considering this, and this court reviews this de novo, the court must only consider the record made before the agency at the time the agency acted. The agency record does not refer simply to the facts presented to the agency, but also includes the reasons given by the agency for taking the action. The court may only look to these contemporaneous justifications in reviewing the agency action. Everything that you described, Your Honor, takes place one year, two years, three years after the stoppage in payments.  I will use some rebuttal time, but I'm going to ask, hold on a minute, I'm going to ask my co-panelists if they have any questions. Judge Berner, do you have any questions of counsel that you'd like to ask? No, thank you. We're fine, thank you. Thank you, Your Honor. Mr. Homehart.  May it please the Court. Assistant U.S. Attorney Peter Baumhart on behalf of the defendants. On two independent bases, the Small Business Administration determined that plaintiff's $5 million loan was not eligible for the CARES Act subsidies that it seeks in this action. First, the loan was not in regular servicing status because it had been deficiently serviced for a year and a half before the CARES Act was ever enacted. Through five separate amendments, in fact, plaintiff failed to pay down the principal on its loan in any meaningful way. The second basis for the SBA's decision is that after the CARES Act went into effect, plaintiff and its lender struck a highly questionable new deal where the SBA would pay off more than $3 million of the loan, repayment terms that were totally at odds with plaintiff's historical and then present ability to pay. What is the sixth modification after the secession of payments? That's correct, Judge Berner. The sixth amendment was entered into in May 2022 after the SBA had undertaken the CARES Act subsidy payments. And didn't the investigation letter say that the first five modifications were proper? I'm sorry, I missed the last part of your question. The investigation letter, I believe it said that the first five modifications were proper. The, I'm sorry, the sixth amendment said that? The investigation letter, did it not say that the first five modifications were proper? The investigation letter I do not think approved the first five amendments as proper. I believe that the final letter from the SBA, which is in the record, made clear that that was part of the irregular servicing of the loan that formed the first part of its decision, that there was no eligibility for the CARES Act subsidy payments. So stepping back to the sixth amendment, this new deal violated specific regulations that would release the SBA from its guarantee, meaning that the loan was no longer a covered loan after that point. The evidence supporting these conclusions, which is all in the administrative record, is more than sufficient to justify the agency's decision that plaintiff's loan was ineligible for CARES Act subsidies. The record also makes clear that plaintiff received... What's the standard of review of that finding? The question, obviously the factual question is, as a matter of fact, was the loan actually in regular service for a six-month period? And you say no, it was never, and there was no eligibility there. What's the standard of review of that finding? Your Honor, to the extent we're talking about the agency's finding, that is reviewed under the arbitrary and capricious standard. The question of which is that whether the SBA relied only on relevant considerations, whether it missed any critical issues, and whether the administrative record flatly contradicts that conclusion. So it's an arbitrary and capricious standard and a substantial evidence standard? That's right, Your Honor. The record also makes clear that plaintiff received the notice and opportunity to be heard that due process requires and that the SBA's decision faithfully applies the CARES Act. So to start with the APA, as I just said, the arbitrary and capricious standard requires the SBA to rely only on... You had a two-year investigation and the recipient of the loan had every opportunity to make its views known in terms of the regular servicing? That's correct, Your Honor. The SBA was asking the lender for all information on the loan's history, starting in, I believe, November 2020. Those communications continued through 2021. The plaintiff submitted an inquiry to the SBA ombudsman in early 2021, which the SBA responded to in May 2021, explaining the reason for the May 2020 payment stoppage. And then plaintiff itself submitted... What was that explanation? The explanation from the SBA in May 2021 was that the loan had been... I think the term was in default, but it was essentially the delinquency that showed on the 1502 report from May 2020. The investigation took place and the determination of default took place after the loan payments were stopped. Is that right? Yes, Judge Berner. So in May 2020, based on the 1502 report data that the lender submitted to the SBA, the loan was, as I understand it from the SBA, the sort of loan tracking computer program generated an exception and sort of kicked the loan out of the eligibility for further subsidies. What data were submitted by the lender that prompted the cessation of payments? The lender submitted a report that indicated in May 2020 that the next payment due date was April 15th, I believe. So it was showing a next payment due date that had already passed, and therefore the indication was that the loan was then delinquent. The lender submitted that in May 2020, but the repayments were stopped in April 2020, the month before? No, you're right. The repayments, there were no further payments made after, excuse me, the SBA made the payments for April and May 2020. And those were due essentially at the beginning of the month. And so the 1502 report from May 2020 came after essentially the due date for the May payment, and thus no payments after that 1502 report were made. So what you're saying is that the repayments stopped in May 2020, and then the investigation that ended with the 2022 report was commenced. So the investigation was commenced only after the repayments stopped. Is that right? Yes, Judge Brewer. What happened was obviously the lender submits this 1502 report data, so the SBA receives information from the lender indicating that the loan is delinquent. And then in September, excuse me, late August 2020, the lender contacts the SBA saying essentially where are the rest of the payments, at which point the SBA is on notice that there is a discrepancy between what the lender submitted and what they're now asking. And that's what got the SBA's attention and led them to investigate the loan. My understanding from the agency is had that investigation revealed nothing more than a bona fide error as to whether the loan was delinquent in May 2020, and assuming that there was funding still available under the CARES Act because the subsidy program was tied to specific appropriated funding, there would have been back payments made. But that's not what the investigation revealed. What the investigation revealed was a history of misservicing of the loan over the course of five amendments, and then a new sixth amendment that was not justified either by plaintiff's historical ability to pay or their then present ability to pay, which in fact looked like just an attempt to get the loan off the books at the federal government's expense. Why would the bank issue a 1502 that says it was delinquent when the SBA was making the payments? Your Honor, we don't have the answer to that question. I think only the lender can answer why it submitted the information that it did. Again, the 1502 report is something that the SBA receives. It's not something that the SBA creates. I understand, but your position is the 1502 report from the bank prompted the stoppage of payments. That's correct. And my question is I thought SBA was making the payments then, so I can't quite figure out why the bank would say they were not being made when the SBA was making them. Your Honor, it could well have just been an administrative error on the bank's part. We don't know why the bank reported that information, but that's the information that the SBA has. And I don't think, I don't understand my colleague to dispute the accuracy of the information that was reported to the SBA at that time, although they disagree that the loan was delinquent at the time. But as I said, if there had just been nothing but a bona fide error by the lender in terms of its reporting and that's all the investigation had uncovered, then the SBA would have made those back payments, assuming that there was still appropriated funding available to do so. But again, that's not what the investigation revealed. The best way I can think of to explain it is it's analogous to perhaps an officer on patrol seeing a car swerve and the officer thinks, you know, maybe the driver's intoxicated, pulls the car over. The driver's not intoxicated, but the officer looks in the back seat and sees a package of illegal drugs. In sort of a similar way, the discrepancy as to the May 2020 1502 report is what got the SBA's attention. And then its investigation revealed, separate and apart from a payment in April 2020, there had been major problems with how the loan had been serviced over the year and a half since origination, as well as the legitimacy of the Sixth Amendment that was entered into after the SBA was essentially on the hook for loan payments. I hope I adequately answered the question. Yeah, it's a little strange. I think we review the final agency action and then we go back and see whether the agency acted reasonably and so forth. But there's a bit of a curiosity as to why the SBA stopped making payments. There's a little bit of something circular because they say they stopped it because they got a 1502 report from the bank saying there was a deficiency in the payments, yet the SBA knows they made the payments. Well, so, Your Honor, again, the way that it works is just that what the SBA gets is data. So I think we tried to flesh this out in our brief. The lender submits a 1502 report to a fiscal and transfer agent who acts as a clearinghouse to submit all data from lenders, all 1502 report data from lenders to the SBA. And so the SBA has a program that tracks the loans, which is what is the spreadsheet that's in the record. And so all that has is information from the lender. It's not like the SBA was separately checking against, you know, whether some new system that would have been tracking CARES Act payments, and especially because the CARES Act essentially created this subsidy program out of whole cloth. And so it's not like the SBA had anything to cross-reference with. It was just relying on the lender to accurately report the status of the loan. And it is curious that the lender submitted the data that it did. I won't disagree with that. But the agency can only act on the information that it receives. Do we have a copy of 1502 in the record? We have. So I think it's JA35. No, that's just a summary. The 1502 report from the bank. We don't have that. No. And I don't know that that itself is submitted to the SBA. Like I said, the 1502 report goes to an intermediary, the fiscal and transfer agent. And then the fiscal and transfer agent submits the data from those reports to the SBA. So what we have is the SBA's, the information the SBA receives from the fiscal and transfer agent. And what's it show? On page 35, what's it show me? It's going to show you that there are two, there's a May 2020 entry that shows, I think there's actually two May 2020 entries that show that the next payment date is April 15, 2020, which indicates that there is a past due payment. Under the CARES Act, a loan is considered in regular servicing status unless it's considered in liquidation status. Isn't that right? Or should it have been in liquidation status?  So the loan is in regular servicing status as relevant here, unless it should have been moved out of regular servicing status into liquidation status prior to the date. So the November 2022 letter, it doesn't say anywhere in that letter that the loan should have been placed in liquidation status. It only says that the May 2020 amendment seems to have been improper. But did the SBA actually make a finding that the loan should have been placed in liquidation status as it was required to do under the CARES Act? Your Honor, there are two explanations in the SBA's letter. One is about the May 2020 amendment, the sixth loan amendment. And the other is where it talks about how the servicing, I think the phrase is, I'm trying to remember exactly, is the servicing on this loan did not comply with loan program requirements. And that is the SBA. Does it ever say that the loan should have been in liquidation status? That's the rule under the CARES Act. That's the standard. So it's the, what the procedural notice says in full on that point is that a loan that should have been moved from regular servicing status under loan program requirements. And so the reference to loan program requirements is in the letter is making that determination. It's saying that this did not comply with loan program requirements, the servicing on the loan. And again, that's a, that is one justification for the SBA's decision. The other is the sixth loan amendment, which, as I mentioned, violated five separate regulatory provisions under 13 CFR section 120.524. That's a one through five. And so separate and apart from whether the loan should have been moved out of regular servicing status before the first payment date, the violation of those regulations releases the SBA from its guarantee. And thus the loan after that point, meaning any, you know, after the enactment of the sixth loan amendment is no longer a covered loan because the CARES Act defines a covered loan as relevant. Here is one that is guaranteed under section 636A, which is the 7A loan program. And so once the SBA is no longer guaranteeing that loan, once it's released from its guarantee, it's no longer a loan guaranteed under section 636A. And so that is separate and apart from the decision on whether the loan should have been moved out of regular servicing status in advance of the first payment date. And I will say the record supports that decision as well regarding the sixth loan amendment. The terms of that amendment required amounts of principal repayment, $775,000 every month, that plaintiff had never been able to meet and in fact could not meet during the life of the sixth amendment, which is more than enough to bear out the SBA's suspicion that the sixth loan amendment was just an attempt by the lender to get the loan off of its books at the federal government's expense. On both grounds, the agency's decision was not arbitrary or capricious. And I would also like to reference briefly, my colleague has focused quite a bit on the May 22nd. If it shouldn't have been under the program, would the borrower be susceptible to repaying the SBA the first two payments it made? No, Your Honor. So another thing that the SBA's letter in November 2022 says is it instructs the lender to return those first two payments. Which the lender has done. Oh, they have done that? Yes. Okay, that was my question. The plaintiff is not monetarily liable for anything at this point to the SBA. And I just want to briefly touch on the May 2020 payment. As we pointed out in our brief, that is not final agency action that is subject to review under the APA because that was not the consummation of the agency's decision making. It had an effect. What was the date you contend is the final agency action? November 2020? I would say that would be the final decision letter in November 2022. There was a decision communicated to the plaintiff on its SF95 administrative claim in December. But the November 2022 decision, I think, was the final decision because the SBA regulates and has a contractual relationship with the lender, not with plaintiff. So, yeah, as we said, the May 2020 payment is not final agency action that is reviewable under the APA. It's not the consummation of the agency's decision making. That decision was consummated in November 2022. The CARES Act has to strike a careful balance here because, on the one hand, Congress wanted these loan guarantees because the loan guarantees were necessary for small businesses to receive the capital that would keep them afloat during a really rough time because the pandemic and COVID had really thrown small businesses into a perilous situation. And the loan guarantees were essential really to the survival of many of these small businesses. But then, on the other hand, this kind of legislation is also subject to abuse. And I'm not sure that the CARES Act, and I think the regular servicing requirement backs that up, I'm not sure that the CARES Act was meant to simply absolve lending institutions of the need to follow some sound banking practice when it loaned money and serviced those loans. So you have that very difficult balance here. And I can understand it from the standpoint of what the CARES Act was designed to accomplish. But also it seems to me that both the regulations and the legislation didn't want even the most dysfunctional and irresponsible lending practices to be reimbursed by the government and that the lenders can't just come to the government to get loans that were never regularly serviced and lean on the government to get, as you put it, a bad loan off the books. So the question is, who strikes the balance? And if you have a two-year agency investigation and all of these amendments and everything and the rest, that seems to me within the parameters of the statute to have the agency strike that kind of balance between making the capital available and not having taxpayer money just thrown out willy-nilly. And I think the agency's entrusted with that kind of balance. And the regular servicing requirement seems to indicate that there is at least some modest check on very bad loans. I mean, that's about the way I can figure it, that an agency has some latitude through its regular servicing requirement to implementing. I see my time has expired, Judge Wilkinson. May I answer your question? Yeah. It will be unsurprising. I agree with you wholeheartedly. I think Congress did strike a balance. You see it on the face of the CARES Act that the idea was to help otherwise healthy loans, and by that I mean those in regular servicing status, whether the storm of COVID and the measures that were implemented in response to it. And in terms of determining whether a loan was in regular servicing status, that's absolutely the agency that strikes that balance, because they have the factual expertise to bring to bear on the specialized world of small business lending, which involves things like prudent lending standards, cost-efficient exercise of remedies. And I would point out that even one of the plaintiff's favorite cases to cite, Motor Vehicle and Manufacturers Associations, says you defer, the courts defer to factual areas within the agency's expertise. In that case, it was NHTSA's view on motor vehicle safety regulations. But your Honor's right. My impression is that these loan guarantees offered lenders were in the great majority of cases honored. Where this strikes me as a bit unusual, of course, where the loans were extended. Under a loan guarantee, in most cases, simply as an empirical matter as I understand it, the loan guarantees were honored by the government. The lender was reimbursed. Is my impression correct? As far as I understand, that is correct. And as I said, had the SBA's investigation revealed nothing more than a bona fide reporting error by plaintiff's lender, the SBA would have honored the guarantee in this case, again, assuming that there were still appropriated funds available. But it was that the SBA... is in some kind of... engaged in some kind of practice here of denying loan guarantees that it has extended and offered to lenders. And that's pretty disturbing. But on the other hand, if we say, well, yeah, you've got to honor the loan guarantee, we're almost saying, well, anything goes. And I'm not comfortable with either of those, what I think are more absolute positions. And the Congress left it to the agency's expertise to resolve what is a typical balance. And it's not as if you just sort of blew these parties off. You undertook a long investigation. And so there's a very extensive administrative record here. And we're under an arbitrary and capricious standard, which is at least deferential or a substantial evidence standard, which are deferential to a considerable extent. And we have to find that the lengthy investigation, the lengthy record that was compiled are all just... we have to just, to reverse it, we have to just blow all that off and say, well, this is arbitrary and capricious. And I'm not sure I see it because a lot of times I say, well, maybe I would have made a different decision had I been on the ground floor. But I'm not on the ground floor. It's just, you know, that's just my thought here is that Congress entrusted the agency to strike that balance. I believe that's right, Your Honor. At this point, I'm well over my time, unless the court has any further questions. I'm happy to rest on our brief. Judge Berner, do you have further questions? No, thank you. All right. Thank you, Your Honor. Mr. John, do you have some rebuttal time? Yes, Your Honor, thank you. There's a number of things to point out from my friend's presentation. There is a chronology in the joint appendix, page 185, that shows that the Sixth Amendment was approved. The Sixth Amendment was approved on the 22nd of May, 2020. It was put in place. The payments for April and May were actually made on June 1st of 2020. So they were made after that Sixth Amendment was put in place. Going to Judge Berner's question. They were made by the SBA? Made by the SBA. That's correct. Now, as I understand the position of the government here, there was some action taken in April or May, and you focus on that enormously, where they stopped payments. Yes. And you say there's no reason to indicate that. As I gather their argument and your argument placed – I'll tell you what I understand, and then you can correct me. But their position is what they got information from the bank that indicated a default position, which is curious, and they accept that. But they say that went to Colson, I guess, and Colson reported it as a problem. And even though SBA was making payments at the time, that prompted an inquiry, and the preliminary inquiry led to a larger inquiry. So that was not necessarily a causative event for disqualifying the loan. What it did is it perhaps unwittingly opened up an investigation, but the investigation disclosed that the loan was inappropriate. And what we review is the final agency action decided on November to see whether the agency reached the right conclusion under the standard of review that we have. Your position is that it would have never been uncovered had the agency not reacted in April or May to that report from the bank. And that's a little bit curious, because even if you're right, there was an investigation that disclosed the loan was an inappropriate one for the CARES Act. At least that's what the agency takes. But we would review that issue based on the November finding, November 22. Your argument is that that's arbitrary and capricious because the whole investigation was initiated by an unsupported act. Is that the right way to understand the two positions? That's not quite our argument, Your Honor. Actually, the investigation that counsel refers to was initiated after PASM filed their Form 95. So the ‑‑ and we think the final action stopping the payments, I think, when we look at the case law, that was the consummation of their activity. They can't stop paying them any more than not paying them. Well, let's just assume it's accidental. Unfortunate, something peculiar happened. But it did start an investigation. They stopped payments. And people looked into it. And I think as early as August or September of that year, people were already noting whether this loan qualified at all. Well, the May 21 letter says that it was stopped because the loan was in default. Right. The loan was in default. Let's assume that's a mistake. Because there were no payments made. Yeah. Let's assume that's a mistake. Their position is it doesn't matter because there was nothing untoward from the agency's point of view. They were acting responsibly to various information received. And they received a 1502 through Coulson, which indicated it was in default. And so the question is, what's going on here? And when they look into it, that leads to things that question the entire loan guarantee. Well, we would, in response to that, we would say even if that is the case, the SBA, if deference must be paid to the SBA in their determination of these loans, then we would look at Joint Appendix 198, which lays out the SBA's own criteria for what is when a loan is not in regular servicing. And it says it's either, if it's moved from regular servicing into liquidation status, which had not happened at the time that the loan was, the payments were stopped. And then again, the loan is in regular servicing status as long as it's not more than 120 days past due. There's no lemon loan provision in here to say, well, it's not in regular servicing because we should have done a better job vetting it. And I'm not arguing that there was a bad job done. What I'm saying is if the court is going to say, well, we have to give deference to the SBA in this, and we are in a post-sloper world, if we're going to say we have to give the deference to the agency on this, then let's look at what the agency actually says about when a loan is in regular servicing. So I think those are also crucial if we're going to say, well, the retroactive decision takes place a year later. The other point, Your Honor, is that in that process, there was no opportunity for PASM to participate at all. They submitted the Form 95 and then later on received a decision. There was no one reached out to PASM. We understand that.  I'm over time. You've been over it in your brief and elsewhere. I'm going to ask my colleagues if they have further questions. Judge Barnett, do you have any additional questions you'd like to ask? No, thank you. I'm fine. I think we have time. Thanks for the court's time. We will come down and re-counsel and then we'll take a brief recess. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Nicole G. Berner